UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MARY PAHMEIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:04-CV-365-TS |
| | ) | |
| MARION COMMUNITY SCHOOLS, | ) | |
| ANDREW M. NIXON, and | ) | |
| KIM KNOTT, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendants Marion Community Schools, Andrew M. Nixon and Kim Knott (collectively the "School") Motion for Summary Judgment. For the reasons set forth below, the Motion is granted in part and denied in part.

**BACKGROUND**

Plaintiff Mary Pahmeier is 69 years old. She began her career with the School in 1962 as a teacher and administrator. She continued her employment with the School in a variety of positions until she was promoted to principal of Jones Middle School ("Jones") in 1993. She served as principal of Jones until that school closed in 2002. She then served one year as interim principal of Justice Thurgood Marshall Middle School ("Justice") until her termination in 2003.

During the 2002–2003 school year, the Marion School Board was faced with financial difficulties which required them to close one of the three middle schools in the district. To aid in

this process, the School conducted public meetings to solicit opinions regarding which school to close. Pahmeier attended one of these public meetings wearing a red sweatshirt in solidarity with teachers who objected to closing Jones. Pahmeier also communicated her disapproval with the decision to close Jones to her teachers. She testified that she made it clear to her staff that she did not agree with Jones's closure "through her actions." It should be noted that while both of these "expressions" occurred before the Board officially voted to close Jones, it appears from the record that the handwriting was on the wall. Finally, Pahmeier never explained to her staff why the school decided to close Jones. Instead, she waited until the School presented a power point program explaining their decision.

After the decision to close Jones was finalized, the School notified Pahmeier that her principal's contract would not be renewed. However, they did give her a position as the interim principal of Justice. According to the School, Pahmeier's position was an interim position because they were in the process of hiring a new superintendent and they wanted the superintendent to have an opportunity to select the principals who would serve under him. The School also appointed an interim principal at McCulloch Middle School and at the high school level.

Effective July 2003, the School hired Defendant Nixon as its superintendent. Dr. Nixon immediately conducted a principal's meeting and provided a list of expectations to the interim principals. However, according to Pahmeier, Nixon spoke only in generalities regarding testing scores and teacher accountability. Nixon did not provide the principals with any specific suggestions, goals, or expectations regarding these issues. Pahmeier also points out that while Nixon handed out a list of expectations, that list stated that "I will be meeting with each administrator to identify my expectations and to provide more focus to them." Pahmeier alleges that she did not meet

2

with Nixon again until September 2003 and that Nixon did little to explain his expectations at that meeting. Instead, he merely informed Pahmeier that he would be recommending a nonrenewal of her contract. At that meeting, Pahmeier asked Nixon to explain his decision, but he remained silent. Instead, Defendant Knott, the Director of Human Resources, allegedly cited only the red sweatshirt incident as "upsetting the board." Later in the meeting, Pahmeier also alleges that Nixon stated "Principals aren't like they used to be." Pahmeier took this to mean that she was too old to be a principal in Nixon's eyes.

Pahmeier requested a improvement plan at the end of meeting, but did not receive one. Instead, Pahmeier received a "directive" which required her to produce a large amount of paperwork including a copy of her daily schedule. Although Pahmeier complied with the directive and turned over all her materials, Nixon was not satisfied. Finally, in November 2003, Nixon stated that there were five reasons for Pahmeier's demotion. Those reasons included:

1. Failure to provide adequate leadership;
2. Failure to adequately supervise the instructional staff;
3. Failure to recognize and distinguish key information from non-essential information;
4. Failure to provide instructional leadership; and
5. Failure to adequately manage the school.

(Letter from Nixon to Pahmeier, November 26, 2003, Plf. Ex. DD; DE 52).  We note that at no time did the School provide Pahmeier with any specific examples supporting these very general criticisms. Interestingly, Nixon also stated that he believed Pahmeier lacked the "skill set" necessary to be a good principal. However, in February 2004, after he made the decision to recommend Pahmeier's termination, Nixon sent a memo requesting input about what skills were necessary to be a principal in the district. Specifically, he requested:

> each Board member to identify up to 2 community persons with whom [Defendant] Knott and [Nixon] can discuss their view of the

3

> qualities/skills [the School] need[s] in the two positions. Board members should also be prepared to articulate the skills that they believe are necessary for the positions.

(Board Update from February 20, 2004, Plf. Ex. 13; DE 52.)

Pahmeier notes that despite her alleged lack of "skill set," the state testing scores of students at Jones actually improved during her tenure at Jones. In fact, they improved at a rate faster than those at Justic or McCulloch. Pahmeier further provided evidence that the "writing was on the wall" about her termination before she even had a chance to prove herself. For example, as early as August 2003, Dr. Nixon notified the board that he was "worried about the leadership at the secondary schools" and warned the board that "it is quite possible that I will be removing/reassigning/disciplining one of our secondary principals before the end of the school year." (Board Notes for August 22, 2003, Pl. Ex. 2; DE 52.) There were only two secondary principals at this time (Pahmeier and Marge Record). Nixon had not personally met Pahmeier at this point. Moreover, on September 26, 2003, Nixon sent a memo to the school board which stated:

> As you are all aware, I informed Mrs. Pahmeier that her performance heretofore does not merit another administrative contract. Obviously, she is not going to go down without a fight. . . . The bottom line is that she does not have the skills or vision to lead a school into the 21st century, and no one has ever told her that before I did.

(Board Update from September 26, 2003, Pl. Ex. 5; DE 52.)

On November 26, 2003, Nixon provided Plaintiff written notification that the School was considering nonrenewal of her contract. Pahmeier acknowledged the written notice and requested a private conference with the superintendent. The School responded that she was entitled to both a private meeting with the superintendent and a private conference with the school board. On January 5, 2003, Pahmeier had a conference with Nixon. Defendant Knott also attended this meeting at

4

Nixon's request. Thereafter, Pahmeier's counsel and the School engaged in rather contentious attempts to schedule Pahmeier's conference with the school board. One major point of contention between the parties was Nixon's continued insistence that he attend that conference. Ultimately, Pahmeier elected not to attend the conference.

The remainder of the school year progressed with Pahmeier as principal until she was placed on administrative leave on June 3, 2004, before the end of her administrative contract. The Board replaced Pahmeier with Thomas Mitchell, a 45-year-old male. Just prior to her leaving, the School held an open house reception for Mr. Mitchell. Pahmeier believes this was an intentional attempt to humiliate and degrade her.

Pahmeier presented evidence of several other older people who worked in Marion community schools who were terminated and replaced with younger individuals during the first two years of Nixon's tenure as superintendent. One such individual was Dan Brock, 60, an assistant principal who was replaced by Jim Fox, 34. Pahmeier also identifies several secretaries whose positions were either eliminated or "restructured" with new qualifications. These individuals were prohibited from reapplying or were not hired in other capacities within the district.

## ANALYSIS

Pahmeier originally alleged five claims in her complaint. First, she alleged that the School violated her First Amendment right to free speech by firing her for speaking out against the School's decision to close Jones. Second, Pahmeier alleged that the School terminated her because of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. Third, Pahmeier alleged that the School breached her administrative contract by denying her private

5

meetings with the superintendent and with the school board. Fourth, Pahmeier alleged that the School intentionally caused her emotional distress ("IIED") by placing her on administrative leave before the end of her administrative contract and by holding a reception for her replacement while she was still the interim principal at Justice. Fifth, and finally, Pahmeier alleged that the school board violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, in relation to health problems that she suffered while she was serving as interim principal at Justice. Pahmeier specifically abandoned her FMLA claim in her response to summary judgment. (Pl. Mem. in Opp'n at 9; DE 53.) Accordingly, summary judgment as to this claim is granted. The Court takes Pahmeier's remaining claims in turn.

### A.   Standard of Review

Summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden rests with the party seeking summary judgment to demonstrate an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 433 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).

**B.     First Amendment Claim**

Generally, "the government cannot retaliate against its employees for engaging in constitutionally protected speech." *Vargas Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). However, where the employee is a policymaker, the First Amendment does not prohibit her discharge "when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Id*. at 271. The Seventh Circuit has declined to state that a policy-maker may be fired for speaking on *any* issue of public concern. *Id*. at 973. But, where the speech "creates a conflict with the policy stance of [the policy-maker's] superiors, the effects on government are acute." *Id*.

In this case, Pahmeier concedes that she is a policymaker. (Pl. Mem. at 3). However, she argues that because her speech was not engaged in speech that related to her superiors or their policies, she is not subject to the policymaker corollary. Essentially, she characterizes the decision to close Jones as a financial decision, not a political decision. Therefore, she argues that her speech does not fall within the type of speech prohibited by the policymaker corollary. The Court disagrees with this argument.

Whether or not Pahmeier's speech can be characterized as "political" in nature is irrelevant where, as here, her speech directly contradicted a policy decision made by her superiors. First, she made a statement (albeit a nonverbal statement) at a public meeting that directly conflicted with the position of the School: that Jones was the school that should be closed. In her own words, Pahmeier wore her red sweatshirt to the meeting "as a sign of solidarity for their campaign to save Jones from closing." (Pl. Mem. at 4). Second, Pahmeier made it clear to her staff "through her actions" that she disapproved of the decision to close Jones. Pahmeier took these actions in spite of the fact that once

7

the decision to close Jones was made, it fell to her to implement the School's decision by closing Jones in an orderly fashion and helping transition Jones teachers to other positions at Justice and McCulloch. She was, thus, directly involved in this policy to which she claims her speech was not related.

We also find it irrelevant that Pahmeier made at least one of her statements at a meeting that was specifically conducted by the School to elicit public opinion. Government agencies hold public hearings to receive comments on all manners of proposed rules and regulations. This does not mean that high-ranking policymakers within those agencies are welcome to attend the hearings with the specific purpose of speaking out against the agencies' proposed rules with impunity. Similarly, it does not make sense that a policymaking school official would be invited to a public meeting for the sole purpose of opposing her superiors' proposed policy.

Because we find that Pahmeier was a policymaker and that her "statements" of wearing a red sweatshirt to a public meeting and communicating her disapproval to her staff "through her actions" directly criticized the School's stated policies, the School's motion for summary judgment as to Pahmeier's First Amendment Claim is granted.

### C.   Age Discrimination Claim

The School requests summary judgment on Pahmeier's ADEA claim for two reasons. First, the School asserts that because Pahmeier is a policymaking official, she is exempt from the ADEA's protections. Second, the School argues that even if Pahmeier is not exempt, it had a legitimate reason for firing Pahmeier.

We first find that Pahmeier is not exempt from the ADEA's protections. The ADEA defines

8

an "employee" as follows:

> (f) The term "employee" means an individual employed by any employer except that term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or *an appointee on the policymaking level* . . . the exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of the State government, governmental agency, or political subdivision.

29 U.S.C. § 630(f) (emphasis added). According to the plain language of the statute, the employee must be both a policy-maker and must occupy an appointed position to be exempt from ADEA protections. *Id*. The statute also contains an exemption to the extension if the employee is subject to civil service laws.

Contrary to Pahmeier's argument, she is not exempt from the exception because she is not subject to civil service laws of a political agency or subdivision. However, the ADEA's protections still apply to Pahmeier because she is not an "appointee."

The School cites two cases, *Pleva v. Norquist*, 195 F.3d 905 (7th Cir. 1999), and *Heck v. City of Freeport*, 985 F.2d 305 (7th Cir. 1993), in support of its contention that the ADEA does not apply to Pahmeier. However, both those cases are readily distinguishable from Pahmeier's claim. In *Pleva*, the Chairman of the Milwaukee Board of Zoning Appeals was demoted from Chairperson to member and ultimately not reappointed at his next term. *Id*. at 910. The Plaintiff received his position when he was appointed by the mayor and approved by the counsel. *Id*. at 909. Further, the mayor alone selects the chairperson from the general membership of the board *Id*. The issue in *Pleva* was not whether the Plaintiff was "appointed" but whether he was policy-making. The Court concluded that he was and found him exempt from the ADEA protections. *Id*. at 917. Similarly, in

*Heck*, the plaintiff was the former general inspector of city health department who received his position after he was appointed by the mayor and approved by the city counsel. *Heck*, 985 F.2d at 306. Once again, the issue was not whether the Plaintiff was appointed, but whether he was a policy-maker. *Id*. at 311.

In contrast, here it does not appear that Pahmeier's position in an appointed position. Indeed, Indiana law suggests the opposite. Ind. Code § 20-26-5-4 sets forth the duties of a school corporation. It gives the corporation the power to "employ, contract for and discharge superintendents, supervisors, principals, teachers . . ." It further gives the corporation the power to "determine the nature and extent of the duties of the persons." Note that nowhere does the statute give the Marion Community Schools the power to "appoint" principals nor does it give the superintendent the power to "appoint" principals. Instead, the corporation has the power to "contract for" principals. If the Marion Community Schools gave the superintendent the power to appoint principals, we have no evidence of that arrangement. Moreover, neither party has presented evidence about the hiring process for middle school principals. We simply have no way to conclude that Pahmeier is an "appointed" official.[1]

Thus, we are left to review the merits of Pahmeier's ADEA claim. The ADEA precludes employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . ." 29 U.S.C. §

---

[1] The Court was unable to find any other decision in which the ADEA "appointed policymaker" exemption was applied to a case involving school principals. Instead, we found numerous cases in which the other courts considered school officials' claims under the ADEA on the merits without any discussion of this exemption. *See, e.g.*, *Ray v. IUKA Spec. Mun. Sep. Sch. Dist.*, 51 F.3d 1246 (5th Cir. 1995); *Schook v. St. Bead School*, 74 F. Supp.2d 1174 (M.D. Ala. 1999); *Gruberg v. Bd. of Ed. of Sewanhaka Cent. H.S. Dist.*, 3 F. Supp.2d 280 (E.D.N.Y. 1998).

623(a)(1). In an ADEA case, an employee can defeat summary judgment by presenting direct evidence of discrimination. If there is no direct evidence, she may still defeat summary judgment by utilizing the indirect, burden-shifting approach defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a *prima facie* case of age discrimination using the indirect method, a plaintiff must demonstrate that: (1) she is a member of a protected class forty years of age and older; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) substantially younger, similarly situated employees were treated more favorably. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002); *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 322 (7th Cir. 2001). Once the plaintiff establishes a *prima facie* case of age discrimination, the employer, to avoid liability, must then produce a legitimate, nondiscriminatory reason for the employee's termination. *See, e.g., Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009 (7th Cir. 2000).

If the employer offers a legitimate, nondiscriminatory explanation for the termination, the plaintiff must then rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual. *Id.* Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

There is no dispute that Pahmeier is a member of a protected class or that she suffered an adverse employment action when she was terminated. However, the parties' dispute whether Pahmeier was meeting her employer's reasonable expectations and whether the decision to fire her was, in fact, pretextual. In particular, the School argues that once it classified Pahmeier as a

11

confidential or policymaking employee, it could fire her on political grounds for any reason. That is, they argue that to the extent that Pahmeier is not exempt from the ADEA, her politically motivated speech gives them the right to fire her and that they have no obligation to come forward with lack of age-based animus to succeed on summary judgment. We disagree.

The School relies on *Wilbur v. Mahan*, 3 F.3d 214 (7th Cir. 1993), for the proposition that "once the employee is classified as confidential or policymaking, he can be fired on political grounds even if there is no evidence that he would not serve his political superiors loyally and competently." *Id*. at 218. However, what the defendants fail to mention is that in making this statement, the Seventh Circuit was discussing the *Eldrod-Branti* line of patronage cases, not First Amendment speech cases. Moreover, in that case, the plaintiff declared his candidacy for the very office that his boss held. Thus, it makes sense that he could be fired for declaring open war on his superior.

We note in that same decision, the Seventh Circuit specifically stated that being a confidential or policymaking official did "not expose him to being fired for belonging to the wrong race, or the wrong church." *Id*. at 217. Similarly, it cannot expose Pahmeier to being fired for being the wrong age. The real reason for the School's decision to fire Pahmeier remains unclear to the Court. Pahmeier's ADEA claim, therefore, remains clouded by substantial questions of material fact which include, but are not limited to:

1. What were the School's specific expectations of Pahmeier?
2. Was she meeting those expectations?
3. If not, what are some specific examples of her failure to meet those expectations?
4. What did Nixon mean when he said that "they don't make principals like they used to?"
5. Was the School's reason for firing Pahmeier pretextual?

Accordingly, the School's motion for summary judgment as to Pahmeier's ADEA claim is denied.

### D.     Breach of Contract Claim

Pahmeier cites two alleged breaches of her contract in her complaint.  First, she points to the School's failure to provide her with "private" meetings with the superintendent and the school board.  Pahmeier argues that Knott's presence at her meeting with Nixon and Nixon's insistence on attending the meeting with the school board violates Indiana law by denying her truly private meetings. Second, Pahmeier alleged that the board breached her contract when she was placed on administrative leave.

Turning first to whether Pahmeier's "private" meetings satisfied Indiana law, the Indiana Teacher Tenure Act governs the hiring and firing of teachers and administrators by public school corporations. It provides for private meetings with the superintendent and/or the school board as follows:

> Sec. 17-3 (a) At least thirty (30) days before giving written notice of refusal to renew a contract under section 17.2 of this chapter, the governing body, or an employee at the direction of the governing body, shall inform the assistant superintendent, the principal, or the assistant principal by written preliminary notice that:
> (1) the governing body is considering a decision not to renew the contract; and
> (2) if the individual files a request with the school corporation for a private conference within five (5) days after receiving the preliminary notice, the individual is entitled to a *private* conference with the superintendent of the school corporation.
>
> (b) If the individual files a request with the school corporation for an additional private conference within five (5) days after the initial private conference with the superintendent of the school corporation, the individual is entitled to an additional *private* conference with the governing body of the school corporation before being given written notice of refusal to renew the contract.

13

Ind. Code § 20-28-8-4 (emphasis added) (identified as repealed § 20-6.1-4-17.3 by the parties). Unfortunately, the statute does not define the term "private." Thus, the question before the Court is one of pure statutory interpretation: what satisfies the "private" meeting requirement?

The School argues that "private" for purposes of this statute means only "out of the public eye." This interpretation makes sense and harmonizes the "private" meeting requirement with other meeting requirements under Indiana law. First, Indiana has an "open door law" that requires that "all meetings of governing bodies of public agencies be open at all times for the purpose of permitting members of the public to observe and record them." Ind. Code § 5-14-1.5-3. Indiana also law requires the superintendent to "attend all meetings of the [school] board except when his re-appointment is under consideration." Ind. Code § 20-23-16-25. Neither of these statutes reference or otherwise exempt "private" meetings under § 20-28-8-4. Thus, a "one-on-one" interpretation of "private" would place the private meeting requirement in direct conflict with both the open door requirement and the requirement that the superintendent attend all school board meetings.

The School's interpretation is also favorable because it enhances Pahmeier's due process rights by allowing her to confront and respond to her accuser, the superintendent. We reject Pahmeier's contention that the superintendent's presence would inhibit her ability to defend herself because she would be intimidated. Nixon's presence would allow Pahmeier to directly respond to his criticisms as they are raised—any "chilling factor" on her defense would be the result of personal feelings, not procedural defects.

Finally, as the School notes, the "out of the public eye" interpretation of "private" allows the School maximum flexibility in its procedures and satisfies the general requirement that the Courts interpret the Indiana Teach Tenure Act to benefit schools over individual teachers. *See Perry-Worth*

14

*Concerned Citizens v. Bd. of Com. of Boone County*, 723 N.E.2d 457, 459 (Ind. Ct. App. 2000). Pahmeier does not provide any contrary legal support for her very restrictive definition of "private." Instead, she merely cites to *Baird v. Bd. of Ed. for Warren Comm. Unit Sch. Dist.*, 389 F.3d 685 (7th Cir. 2004), which considers provisions of Illinois law and denies summary judgment on a § 1983 claim where there were inadequate hearing procedures. There is no "hearing" requirement under Indiana law. *Joseph v. Lake Ridge School Corp.*, 580 N.E.2d 316 (Ind. Ct. App. 1991). Instead, at most, Plaintiff is entitled to a "private" meeting with the superintendent and the school board. The School provided those meetings to Pahmeier in accordance with Indiana law.

As to the second allegation, the School asserts that it did not breach any provision of law nor can Pahmeier cite to any provision of her contract which would prohibit the School from placing Pahmeier on administrative leave prior to the running of her administrative contract. Pahmeier does not respond to this argument and, thus, has waived this claim. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 n.2 (7th Cir. 1996) (finding that the plaintiff abandoned his FMLA claim after failing to respond to arguments regarding FMLA claim in the defendant's motion for summary judgment).

Because the School provided Pahmeier with "private" meetings under Indiana law and because Pahmeier has waived any claim for breach of contract relating to her early administrative leave, the School's Motion for Summary Judgment as to the breach of contract claims is granted.

### E. Intentional Infliction of Emotional Distress

Pahmeier's claim for intentional infliction of emotion distress fails for two reasons. First, the Indiana Tort Claims Act bars her claim. Second, even if her claim was not barred, she cannot meet

15

the high burden necessary to succeed on such a claim.

    The Indiana Tort Claims Act provides that:

> A governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from the following:
>
> * * *
>
> (7) The performance of a discretionary function.

Ind. Code § 34-13-3-3. The Indiana Supreme Court has held that discretionary functions include employment decisions. *Foster v. Percy*, 387 N.E.2d at 449–50. Specifically,

> [I]t is a well-settled common law and now statutory rule in this State that a government employee or official who has discretionary functions enjoys immunity for acts within the scope of his employment and will not be held liable for any errors, mistakes of judgment or unwise decisions he may make in the exercise of that discretion . . . .Clearly the employment and supervision of . . . employees in governmental offices . . . is a discretionary function.

*Id*.

    In this case, Pahmeier cites only her early placement on administrative leave and the School's decision to hold a reception for her replacement before her time as principal expired as grounds for her IIED claim. Both of these actions are clearly discretionary functions within the meaning of the Indiana Code. A decision to place an employee on administrative leave is an employment decision. Thus, according to the Indiana Supreme Court, it falls squarely within the parameters of the statute. The School's decision to hold an early reception for her replacement, while perhaps ill-timed, is nevertheless also a discretionary function. Thus, Pahmeier's claim is barred by the Indiana Tort Claims Act.

    In any event, even if the School could be sued for IIED, their conduct does not rise to the level

required to establish the tort of intentional infliction of emotional distress. "In the appropriate case, the question can be decided as a matter of law." *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind. Ct. App. 2001) (finding no outrageous conduct where a store security manager accused an employee of substance abuse, shoplifting, and dishonesty in a gruff and intimidating manner, where the security manager's actions occurred in the context of a detainment for the purpose of determining the extent of the employee's unauthorized conduct); *see also Conwell v. Beatty*, 667 N.E.2d 768, 775–77 (Ind. Ct. App. 1996) (finding no outrageous conduct where a sheriff announced a deputy's arrest at a press conference and refused to assist that deputy in completing retirement forms).

In this case we cannot say that the school's conduct "is so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable . . ." *Holbrook v. Lobdell-Emry Mfg. Co.*, 219 F.3d 598, 601–02 (7th Cir. 2000). Thus, even if one were to conclude that the Indiana Tort Claims Act did not bar Pahmeier's claim, it matters not because they do not meet the extreme behavior that this tort is aimed at eradicating. The School's motion for summary judgment is therefore granted with respect to the claim of intentional infliction of emotional distress.

### F.    Individual Liability for Nixon and Knott

Lastly, Nixon and Knott have moved for summary judgment on claims brought against them individually. The only claim that survives summary judgment in this case is Pahmeier's ADEA claim. As the individual defendants correctly note, there is no supervisor liability for ADEA claims. *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1279–82 (7th Cir. 1995). In her response, Pahmeier only asserts that the individual defendants are liable for violations of the First Amendment and does not address her ADEA claim at all, thereby waiving any claim to individual liability for

17

Defendants Knott and Nixon. For these reasons, individual Defendants Knott and Nixon's motion for summary judgment with respect to their individual liability is granted.

## CONCLUSION

Pahmeier is a policymaker for purposes of the First Amendment who directly criticized her superiors thus defeating her First Amendment claim. However, because she was not an appointed policymaker, the ADEA still applies. Remaining questions of material fact surround Pahmeier's ADEA claim and preclude summary judgment on that issue. The School provided Pahmeier with "private" meetings within the meaning of Indiana law and were immune for their discretionary employment decision under the Indiana Tort Claims Act thereby defeating Pahmeier's state law claims.

The School's motion for summary judgment as to Pahmeier's ADEA claim [DE 42] is DENIED. The motion is GRANTED as to all of Pahmeier's other claims, including all claims brought against Defendants Knott and Nixon individually.

SO ORDERED on March 17, 2006.

>   /s/ Theresa L. Springmann
>  THERESA L. SPRINGMANN, JUDGE
>  UNITED STATES DISTRICT COURT